## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
## WINCHESTER DIVISION

| | | |
|---|---|---|
| RAY COMER and MARY NABORS, <br> As Parents and Next Friend of SHELBY <br> LEANN COMER, | ) <br> ) <br> ) <br> ) <br> ) | |
| Plaintiffs, | ) <br> ) | |
| v. | ) <br> ) | **CASE NO.: 4:18--58** <br> **JURY DEMAND** |
| CLINT SHRUM, in his Official Capacity as SHERIFF <br> of GRUNDY COUNTY, TENNESSEE, <br> CLINT SHRUM, individually, TONY BEAN in his <br> Official Capacity as a deputy Sheriff <br> of Grundy County, Tennessee TONY BEAN, <br> Individually, and MIKE HOLMES, Individually | ) <br> ) <br> ) <br> ) <br> ) <br> ) | **McDonough/Lee** |
| Defendants. | ) <br> ) | |

## RESPONSE IN OPPOSITION
## TO MOTION FOR SUMMARY JUDGMENT
## FILED BY CLINT SHRUM IN HIS INDIVIDUALY CAPACITY
## AND HIS OFFICIAL CAPACITY

Come the Plaintiffs and file this response in opposition to the Motion for Summary Judgment filed by the Defendant Clint Shrum (hereinafter Shrum).

## I
## INTRODUCTION

The Defendants Clint Shrum (hereinafter Shrum) and Tony Bean (hereinafter Bean) have filled a motion of summary judgment on all claims against them in <u>both</u> their official capacities and individual capacities. They raise three (3) issues or reasons to support their request. First they rely on qualified immunity in both their official and individual capacities. Second the lack of policy and/or custom related to improper training. Third, because neither Shrum nor Bean

1

directly participated in the "events giving rise to this matter" that is the shooting to death of Shelby Comer the individual claims should be dismissed.

The Plaintiffs filed this suit because the Defendant Mike Holmes (hereinafter referred to as "Holmes") a part-time Grundy County deputy sheriff used excessive force or deadly force when he fired thirteen (13) bullets at a Ford Mustang being operated by Jacky Bean (hereinafter referred to as "Jacky Bean") one of which struck and killed Shelby Leann Comer, the Plaintiffs twenty year old daughter that was a front seat passenger in the Mustang.

This excessive force or deadly force case is unusual for several reasons. The most unusual aspect is that Holmes was not a certified Law Enforcement Officer and had never been to a police school or academy before he shot Shelby Comer. Another unusual aspect of this particular case is that there is a surviving witness, Jacky Bean. This witness contradicts much of the story or stories that Holmes has told over the course of time.

### FACTS OF THE SHOOTING

Because Jacky Bean survived the onslaught of bullets fired by Holmes at the Mustang there are two (2) versions of what transpired on B mine Road on December 23, 2017. The Jacky Bean version and of course a totally different version told by Holmes.

### JACKY BEAN VERSION OF THE FACTS

On December 23, 2017 at approximately 10:30 p.m. Shelby Leann Comer was a passenger in a vehicle being operated by Jacky Bean. Jacky Wayne Bean, Jr. (Jacky Bean) was operating or driving a Ford Mustang automobile (hereinafter referred to as "Mustang" or "the Mustang"). At approximately 10:30 p.m. on December 23, 2017, Holmes was on duty and working as a part-time deputy sheriff for the Grundy County Sheriff's Department and driving a marked Sheriff's Department patrol vehicle (hereinafter patrol vehicle). At approximately 10:30

2

p.m. on December 23, 2017, Holmes attempted to initiate a traffic stop of the Mustang being driven by Jacky Bean.[1] The Mustang failed to stop and after a short pursuit the Mustang pulled over and then spun around so that the Mustang was facing the patrol vehicle driven by Holmes. At this point the Mustang was stopped. (Jacky Bean deposition-Attached to this response as **Exhibit A**; Pages 125 line 21-Page 126 Line 8) Jacky Bean was involved in a police pursuit and eventually a shooting on December 23, 2017. There was only one officer that was present when the shots were fired. That officer was Holmes. The shooting occurred on B Mine Road.[2]

The Mustang windows were rolled up the radio was on and the heater was on. The weather was cold, raining and foggy. Jacky Bean had a hard time seeing the road because of the fog.[3] Holmes got out of his patrol vehicle and he immediately started firing at the Mustang. [4]The two vehicles were facing each other.[5] Holmes has admitted that he fired a total of fifteen (15) or thirteen (13) shot, depending on which version is to be believed, at the Mustang.

Holmes than worked his way to the driver's side of the Mustang and then started firing into the side of the vehicle.[6] Jacky Bean ducked down in the seat after the first shot and when Holmes started shooting into the side Jacky Bean put the car in gear and tried to pull off.[7] Jacky Bean did not drive the Mustang forward until after Holmes was to the side of the Mustang. When Jacky Bean started to drive the Mustang forward it was to get away from the bullets that were coming in through the driver's side door. Jacky Bean was not trying to run over Holmes.[8]

---

[1] (Second Amended Complaint paragraphs 12-15; Admitted is substance by the Shrum and Bean.)
[2] (Jacky Bean deposition Page 33 line 5-24; excerpts attached to this response as **Exhibit A**)
[3] (Jacky Bean deposition Page 126 lines 9-24)
[4] (Jacky Bean deposition Page 39 line 13-24)
[5] (Jacky Bean deposition Page 41 lines 19-22)
[6] (Jacky Bean deposition Page 41 lines 20-25)
[7] (Jacky Bean deposition Page 127 lines 5-20)
[8] (Jacky Bean deposition Pages 127 line 21-Page 128 Line 13)

Four (4) shots struck the driver's door. Their path was from outside to inside and from driver side to passenger side. (Trial testimony of T.B.I. agent Jessica Hudson from Criminal trial of Mike Holmes. Tr. Page 370 Line 15 Page-373 Lines 19-22; excerpts attached to this response as **Exhibit B**) As Jacky Bean was trying to get away from the barrage of bullets he believes that the Mustang's driver's side collided with and scrapped down the driver's side of the patrol vehicle and came to a stop. As Holmes approached the Mustang to check on the occupants it drove off. As Jacky Bean was driving away Holmes fired 5 shots at the rear of the Mustang. (Holmes deposition Page 77 Lines 6-8; excerpts attached to this response as **Exhibit C**) Then Shelby Comer "started yelling she was shot."[9]

Jacky Bean was not armed and did not have a pistol when he stopped the Mustang. Jacky Bean did not point a gun or pistol at Holmes during the traffic stop. (Jacky Bean deposition Page 132 Lines 16-23)

## LAW AND ARGUMENT

### DEFENDANTS FIRST ISSUE

### THE DEFENSE OF QUILIFIED IMMUNITY IS NOT AVAILABLE TO SHRUM AND BEAN IN THEIR OFFICAIL CAPACITIES

The Defendants first issue is because the actions of Mike Holmes were "objectively reasonable and therefore qualified immunity is applicable to the extent that all claims against Defendants Shrum and/or Bean in their official and/or individual capacities fall as a matter of law." (Defendants' Brief in support of Motion for Summary Judgment [Doc. 68-1] page 6.)

However the Sixth Circuit in *United Pet Supply, Inc. v City of Chattanooga, Tennessee* 768 F.3d 464, 483-484 (6th Cir. 2014) has held that qualified immunity is a defense available

---

[9] (Jacky Bean deposition Page 128 Line 18- Page 129 Line 11)

4

only to individual government officials sued in their personal capacity. As such the defense of qualified immunity is unavailable to the public entity itself. The court states:

> We have always understood qualified immunity to be a defense available only to individual government officials sued in their personal capacity. "As qualified immunity protects a public official in his individual capacity from civil damages, such immunity is unavailable to the public entity itself." *Everson v. Leis,* 556 F.3d 484, 501 n. 7 (6th Cir.2009); *see also Hidden Vill., LLC v. City of Lakewood,* 734 F.3d 519, 523 (6th Cir.2013) ("Lakewood is not eligible for qualified immunity because it is a city, not an individual.")."

The Defendants motion for summary judgment based on qualified immunity in their official capacity should be DENIED.

## A
## HOLMES SHOOTING WAS OBJECTIVELY UNREASONABLE
### (i)
## THE SHOOTING AT THE MUSTANG CONSTITUTES A SEIZURE OF SHELBY COMER

The Defendants are not entitled to qualified immunity in their individual capacity because the shooting was **objectively unreasonable** even under the Holmes version.

In *Fisher v The City of Memphis* 234 F.3d 312 (6th Cir. 2000) one issue was if the officer's actions constituted a seizure of Ms. Fisher. Officer William Taylor of the Memphis Police Department stopped to speak to two young women. As they spoke in the middle of Speed Street, they noticed a vehicle driven by Demetria Becton ("Becton") approaching in their direction. To avoid being hit, the two women jumped onto the curb, and the Officer jumped onto the hood of his police car, simultaneously firing his gun at the car. The bullet went through the driver's side window and hit the passenger, Elitia Fisher. The defendant officer argued that he was shooting at the driver and thus he did not seize Ms. Fisher. The Court rejected that argument reasoning that by shooting at the driver (Becton) of the moving car the officer intended to stop the car effectively seizing everyone inside the car including, the plaintiff in that case, Ms.Fisher.

5

The Court stated:

> "Here, Becton's car was the intended target of Defendant's intentionally applied exertion of force. By shooting at the driver of the moving car, he intended to stop the car, effectively seizing everyone inside, including the Plaintiff. Thus, because the Defendant "seized" the Plaintiff by shooting at the car, the district court did not err in analyzing the Defendant's actions under the Fourth Amendment." *Fisher v The City of Memphis* at 319 (Footnote omitted.)

In this case Mike Holmes' own testimony establishes that he was shooting at the driver of the Mustang. Therefore his actions seized everyone inside the car including Shelby Comer. In *Rodriguez v Passinault* 637 F.3d 675, 687 (6th Cir. 2011) the Court extensively examines this issue and reaffirms the decision in Fisher *v The City of Memphis.*

## SEGMENTING RULE

In deadly force cases, the Sixth Circuit generally applies a "temporally segmented analysis to the possible erroneous actions taken by police officers." *Chappell v. City of Cleveland,* 585 F.3d 901, 914 (6th Cir. 2009) Referred to as the "segmenting rule" or "segmenting approach," the Sixth Circuit "embrace[s] a somewhat narrow interpretation of the Supreme Court's mandate that courts look to the totality of the circumstances in determining if excessive force is used." *Claybrook v. Birchwell*, 274 F.3d 1098, 1103 (6th Cir. 2001)   In this case there are three (3) segments. The shot or shots Holmes fired at the front of the Mustang, the shots Holmes fired at the side of the Mustang, and the shots Holmes fired at the back or rear of the Mustang as it drives away.

## JACKY BEAN VERSION

Under the Jacky Bean version the shots fired by Holmes in all three segments were an excessive use of force. Holmes was never in any danger. Jacky Bean did not have a gun and never pointed a gun at Holmes. (The reason Holmes gives to justify the first shots at the front of the Mustang, segment one.) (Jacky Bean deposition Page 132 Lines 16-23)  Holmes gets out of

his patrol car and just starts shooting at the Mustang. Jack Bean never drove the Mustang at or toward Holmes. Jacky Bean is clear that he did not drive or move the Mustang forward until Holmes was beside the Mustang. Jacky Bean knows Holmes was to the side of the Mustang because the bullets were coming through the drivers' door. (Jacky Bean deposition Pages 127 line 21-Page 128 Line 13) In this version of the shooting Holmes was never in the path of the Mustang when the Mustang was moving forward.

In **_Lewis v Charter Township of Flint_** 660 Fed. Appx. 339 (6th Cir 2016) the court discusses deadly force when a person attempts to flee in a vehicle. The Court holds that the officer may not use deadly force once the car moves away leaving the officer and bystanders in a position of safety. The Court of Appeals reaffirms decades old precedent that when the car no longer presents an <u>imminent danger</u> the officer is not entitled to use deadly force. As the court explains:

> "It has long been established that "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." **_Tennessee v. Garner_**, 471 U.S. 1, 11, 105 S.Ct. 1694, 85 L.Ed.2d 1 (1985). However, "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others, it is not constitutionally unreasonable to prevent escape by using deadly force." **_Brosseau v. Haugen_**, 543 U.S. 194, 203, 125 S.Ct. 596, 160 L.Ed.2d 583 (2004) (alteration in original) (quoting <u>_Garner_, 471 U.S. at 11, 105 S.Ct. 1694</u>; _see also_ **_Pollard v. City of Columbus, Ohio_**, 780 F.3d 395, 403 (6th Cir. 2015). Where a person attempts to flee in a vehicle, "police officers are 'justified in using deadly force against a driver who objectively appears ready to drive into an officer or bystander with his car," but "may not use deadly force once the car moves away, leaving the officer and bystanders in a position of safety.' " **_Godawa v. Byrd_**, 798 F.3d 457, 464 (6th Cir. 2015) (quoting **_Cass v. City of Dayton_**, 770 F.3d 368, 375 (6th Cir. 2014)). Thus, "where the car no longer 'presents an imminent danger' an officer is not entitled to use deadly force to stop a fleeing suspect." _Id._ (quoting **_Smith v. Cupp_**, 430 F.3d 766, 775 (6th Cir. 2005)'"

Accepting the facts in a light most favorable to the Plaintiffs the Jacky Bean version requires this Court to DENY the Defendants motion based on qualified immunity as to their

individual liability. Holmes shooting at the Mustang from the first shot to the last was excessive. Holmes was never in any danger and he killed an innocent girl in a fit of apparent rage because the Mustang did not comply and immediately stop.

**(ii)**
**MIKE HOLMES VERSION**

Even if Holmes had succeeded in killing all of the occupants of the Mustang, with his indiscriminant spraying of thirteen bullets, and we never knew Jacky Bean's version of the facts the testimony of Holmes himself establishes that he used excessive force and therefore violated the Fourth Amendment.

**REASONABLENESS OF THE USE OF DEADLY FORCE IS DETERMINED AT THE MOMENT DEADLY FORCE IS APPLIED**

The Defendants argue that Holmes "only used his gun in response to a threat when Jacky Bean (1) pointed a silver handgun at Defendant Holmes; and (2) drove his vehicle directly at Defendant Holmes and in the direction other law enforcement were coming."[10] As explained above even if the first shot by Holmes at the windshield of the Mustang was justified the remaining shots in the side and rear of the Mustang were not justified. Just because an officer is justified in using deadly force at one point "he does not retain the right to shoot at any time thereafter with impunity." ***Mullins v Cyranek*** 805 F.3d 760, 768 (6th Cir. 2015

The proper review of the use of deadly force is to look at or focus on that moment just prior to Holmes firing the shots. In ***Bouggess v. Mattingly***, 482 F.3d 886, 889 (6th Cir. 2007) the court establishes this as the critical point of time. There the court states: "therefore, we measure the reasonableness of the use of deadly force at a particular time based on an "objective assessment of the danger a suspect poses at that moment." Accord: ***Lemmon v city of Akron***,

---

[10] (Defendants' Brief in support of Motion for Summary Judgment. ([Doc. 68-1] page 8.)

***Ohio*** 768 Fed.Appx.410, 415 (6th Cir. 2019)

In ***Hicks v Scott*** 958 F.3d 421, 435 (6th Cir. 2020) the court reviews the law applicable to excessive force cases.[11] The Fourth Amendment prohibits the use of excessive force. Of the three (3) ***Graham*** factors: (1) "the severity of the crime at issue," (2) "whether the suspect pose[d] an immediate threat to the safety of the officers or others," and (3) "whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight, the court in ***Hicks v Scott*** emphases that the critical factor in the use of force is whether the suspect presented an immediate danger to the officers or others. The officer's use of deadly force is only reasonable if the officer had "probable cause to believe that the suspect pose[d] [such] a threat." The test is one of objective reasonableness in light of the facts and circumstances confronting the officer, in this case Holmes at the time Holmes made the decision to use deadly force.

> "The Fourth Amendment's prohibition against unreasonable seizures prohibits the use of excessive force. *King v. Taylor*, 694 F.3d 650, 662 (6th Cir. 2012) The test is one of objective reasonableness: "[T]he question is whether [an] officer['] s actions [were] 'objectively reasonable' in light of the facts and circumstances confronting [her]." *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989) In assessing those circumstances, we consider three main factors: (1) "the severity of the crime at issue," (2) "whether the suspect pose[d] an immediate threat to the safety of the officers or others," and (3) "whether [the suspect was] actively resisting arrest or attempting to evade arrest by flight." *Untalan v. City of Lorain*, 430 F.3d 312, 314 (6th Cir. 2005) (quoting *Graham*, 490 U.S. at 396, 109 S.Ct. 1865). When an officer uses deadly force, the critical factor is whether the suspect presented an immediate danger to the officers or others. *Mullins v. Cyranek*, 805 F.3d 760, 766 (6th Cir. 2015) To that end, an officer's use of deadly force is only reasonable if she had "probable cause to believe that the suspect pose[d] [such] a threat." *Untalan*, 430 F.3d at 314." ***Hicks v Scott*** 958 F.3d 421, 435 (6th Cir. 2020)

---

[11] As to any issue of qualified immunity, if it was to be raised by Holmes in this case, Plaintiffs recognize that for a case to provide knowledge it must be decided prior to the incident involved in this case. While ***Hicks v Scott*** is decided last year the cases that it reviews and approves were all decided in 2015 or before.

In *Mullins v Cyranek* 805 F.3d 760, 766 (6th Cir. 2015) the court, again, emphases that the question to be answered in the case presently before this Court is whether it was reasonable for Holmes to believe that the Mustang or Jacky Bean "posed a significant threat **at the time**" Holmes fired his weapon. *Id.* (Emphasis added.) The court determines that deadly force may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm. A person, such as Shelby Comer, has a right not to be shot unless they are perceived as posing a threat to officers or others.

> "The question of whether it was reasonable for Cyranek to believe that Mullins posed a significant threat **at the time Mullins was shot is the crux of this appeal**. In excessive force cases, the threat factor is "a *minimum* requirement for the use of deadly force," meaning deadly force "may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm." <u>Untalan v. City of Lorain,</u> 430 F.3d 312, 314 (6th Cir.2005) (emphasis added); *see also* <u>Ciminillo,</u> 434 F.3d at 468 (stating that a person has a "right not to be shot unless they are perceived as posing a threat to officers or others") On appeal, Cyranek concedes that he shot Mullins only after Mullins threw his gun, but he maintains that the confrontation unfolded in such rapid succession that he did not have a chance to realize that a potentially dangerous situation had evolved into a safe one. *See* <u>Smith v. Cupp,</u> 430 F.3d 766, 774–75 (6th Cir.2005)." *Mullins v Cyranek* 805 F.3d 760, 766 (6th Cir. 2015) (Emphasis supplied.)

In *Jacobs v Alam* 915 F.3d 1028, 1040-1041(6th Cir. 2019) the court again determines: "[W]hether the use of deadly force <u>at a particular moment</u> is reasonable depends primarily on objective assessment of <u>the danger a suspect poses at that moment</u>. The assessment must be made from the perspective of a reasonable officer in the defendant's position." (Emphasis supplied.)

Finally in *Foster v Patrick* 806 F.3d 883, 887 (6th Cir. 2015) the court again determines that the ultimate question is whether the officer had an objective reasonable belief that the suspect posed an imminent threat of serious physical harm to the officer or others at the time when the officer shot the suspect.

Case 4:18-cv-00058-TRM-SKL   Document 78   Filed 04/18/21   Page 10 of 25   PageID #: 1162

"We focus on the following factors to determine whether there is probable cause to believe that the suspect poses an imminent threat of serious physical harm: "(1) the severity of the crime at issue; (2) whether the suspect poses an immediate threat to the safety of the officers or others; and (3) whether the suspect is actively resisting arrest or attempting to evade arrest by flight." ***Bouggess v. Mattingly***, 482 F.3d 886, 889 (6th Cir.2007) The ultimate question is whether Patrick had an objectively reasonable belief that Foster posed an imminent threat of serious physical harm to him or others **when he shot Foster.** *See id.* at 890. If the answer is no, then the use of deadly force violated Foster's Fourth Amendment right." (Emphasis supplied.)

In ***Hermiz v City of Southfield*** 484 Fed. Appx. 13 (6th Cir. 2012) the court determines that well established law existed at least as of 2007 that would inform a reasonable officer that shooting a driver while positioned to the side of his fleeing car violates the Fourth Amendment. *Id.* at 17 In ***Lewis v Charter Township of Flint*** 660 Fed. Appx. 339 (6th Cir 2016) the court discusses deadly force when a person attempts to flee in a vehicle. The officer may not use deadly force once the car moves away leaving the officer and bystanders in a position of safety. Even under Holmes' version Jacky Bean did not pose a threat to Holmes or anyone else at the moment that Holmes fired the four (4) shots into the rear of the Mustang.

The law is clear the shots at the rear of the Mustang were excessive force. Jacky Bean did not pose a threat of imminant harm to Holmes or any others at the time Holmes fired the last shots at the rear of the Mustang. Even Sheriff Shrum agrees that the shots fired by Holmes at the rear of the Mustang were not consistent with Shrums' training and experience. In fact Shrum, as a reasonable law enforcement officer, testified that he "would not have fired the shots at the rear of the vehicle as it was leaving." (Shrum deposition Page 178 Line 11-Page 179 Line 22; excerpts attached as **Exhibit D**) Plaintiffs' expert Robert E. Allen, Jr. has filed his affidavit that Holmes did not act in accordance with or was not compliant with recognized standards for police tactics, policies, procedures and standards on the subject of use of deadly force when Holmes fired the last five shots at the back or rear of the Mustang. (See; Allen affidavit paragraphs L-U

11

pages 14-17.Attached to this response **as Exhibit E.**)

## II
## DEFENDANTS' SECOND ISSUE
## POLICY, PRATICE OR CUSTON

The Defendants <u>second</u> issue is that Plaintiffs have filed to establish a policy, practice or

custom that caused Plaintiffs' injuries. (Defendants' brief page 11 [Doc. 68-1]) Defendants omit

that there are several other ways to establish liability of Shrum and Bean in their official

capacities, which is in reality Grundy County. In ***Flagg v City of Detroit*** 715 F.3d 165, 174-175

(6th Cir. 2013) the court determines that a single decision can constitute a policy, if that decision

is made by an official who possesses final authority to establish municipal policy with respect to

the action ordered. In Tennessee the Sheriff is an official. ***Spurlock v Sumner Cty.*** 42 S.W.3d

75, 82 (Tenn. 2001) As established Shrum made the decision to allow Holmes to work more

hours per month that allowed. As a result Holmes was required to be a certified officer. Buthe

was not on the night he shot Shelby Comer.

***Ouza v City of Dearborn Heights, Michigan***969 F.3d 265 (6th Cir. 2020) the court finds

there are at least two situations in which inadequate training could be found to be the result of

deliberate indifference. The second way "single-incident liability" which the Plaintiffs have

established. As the court states:

> "However, there is another way in which a plaintiff can show a genuine
> factual dispute regarding deliberate indifference. In a "narrow range of
> circumstances," a plaintiff can show that a municipality was deliberately
> indifferent by "fail[ing] to equip law enforcement officers with specific tools to
> handle recurring situations." <u>Brown, 520 U.S. at 409, 117 S.Ct. 1382</u> As the
> Supreme Court explained in <u>City of Canton</u>, "it may happen that in light of the
> duties assigned to specific officers or employees the need for more or different
> training is so obvious, and the inadequacy so likely to result in the violation of
> constitutional rights, that the policymakers of the city can reasonably be said to
> have been deliberately indifferent to the need." <u>489 U.S. at 390, 109 S.Ct. 1197</u>.

Case 4:18-cv-00058-TRM-SKL   Document 78   Filed 04/18/21   Page 12 of 25   PageID #: 1164

[1]So, for example, if a municipality failed to provide any training to its officers on the use of deadly force, it would be liable to a person unconstitutionally killed by the police, given that "city policymakers know to a moral certainty that their police officers will be required to arrest fleeing felons" and "[t]he city has armed its officers with firearms, in part to allow them to accomplish this task." *Id.* at 390 n.10, 109 S.Ct. 1197 In that situation, "the need to train officers in the constitutional limitations on the use of deadly force ... can be said to be 'so obvious,' that failure to do so could properly be characterized as 'deliberate indifference' to constitutional rights." *Id.* (internal citation omitted); *accord, e.g.*, *Shadrick v. Hopkins County*, 805 F.3d 724, 739 (6th Cir. 2015); *Cherrington*, 344 F.3d at 646 Under this approach of demonstrating deliberate indifference, a plaintiff does not need to show that the municipality had notice of a pattern of unconstitutional conduct. *Shadrick*, 805 F.3d at 739 (citing *Connick v. Thompson*, 563 U.S. 51, 63–64, 131 S.Ct. 1350, 179 L.Ed.2d 417 (2011)). Instead, a plaintiff can show deliberate indifference based on "single-incident liability" if the risk of the constitutional violation is so obvious or foreseeable that it amounts to deliberate indifference for the city to fail to prepare officers for it. *Connick*, 563 U.S. at 63, 131 S.Ct. 1350."

## SHRUM AND BEAN KNEW HOLMES WAS NOT A CERTIFIED OFFICER BUT KNOWINGLY ALLOWED HOLMES TO PERFORM THE JOB OF A CERTIFIED OFFICER

Holmes was employed as a part-time deputy on July 3, 2016. As explained below a part-time deputy is required by Tennessee law to have only 80 hours of training, provided by Grundy County, as opposed to a certified officer that is required to have a minimum of 400 hours of training and have graduated from a State approved Law Enforcement school. Tennessee law provides that a part-time officer may not work more than 100 hours per month. In the event the part-time officer works more than the 100 hours per month he must be reclassified as a full-time or certified officer and meet all of the requirements for training to be a certified officer. In the 18 months that Holmes worked for Grundy County he worked more than 100 hours in 16 of the 18 months. This fact was known by Shrum and Bean and they allowed and encourage this action even though Holmes was not a certified officer and did not meet the requirements to be certified. As a result Holmes was performing a job he was not legally allowed to perform and it was a

violation of State law and POST rules. Shrum and Bean knowing allowed, encouraged and facilitated Holmes to act in this illegal action.

*T.C.A.* 38-8-101 through *T.C.A.* 38-8-122 addresses the training of police officers in Tennessee. *T.C.A.* 38-8-102 establishes the Tennessee Peace Officer Standards and Training Commission. ***Boyce v Tennessee Peace Officer Standards and Training Commission*** 354 S.W. 3d 737, 742 (Tenn. Ct. App. 2011)[12] *T.C.A* 38-8-105 (a) provides that:

> "Requirements for minimum standards as set forth in this part or as required by the commission shall be mandatory and binding upon any municipality, county or political subdivision of this state." (Emphasis supplied)

All persons that are employed as a full time officer shall comply with the Basic Law Enforcement Course requirements before being certified as a law enforcement officer. POST rule 1110-02-.01(1) The minimum training for a certified officer is the Basic Law Enforcement Course that includes a minimum of 400 hours of instruction and study. POST rule 1110-03- .01(1)(a). The minimum curricula requirements are set out in POST rule 1110-07-.01, consist, along with other courses, the following Firearms; 40 hours ((b)(1); Criminal and Constitutional law and Procedures; 50 hours (7).

*T.C.A.* 38-8-101(3)"[13] as well as POST rules 1110-01.-01(b) and 1110-08.-01(1)

---

[12] The Commission was established to develop, plan, and implement law enforcement training programs for local law enforcement officers in Tennessee, establish uniform standards for the employment and training of police officers and to establish minimum standards and curriculum requirements for courses of study for training police officers. *Carter v McWherter* 859 S.W.2d 343, 345 (Tenn. Ct. App. 1993)

[13] "(3) "Part-time police officer," "temporary police officer," "reserve police officer," or "auxiliary police officer" means any person employed by any municipality or any political subdivision of the state of Tennessee whose primary responsibility is to support the full-time police officer in the prevention and detection of crime, apprehension of offenders, and assisting in the prosecution of offenders for appropriate remuneration in measure with specifically assigned duties or job description. Part-time police officers shall work not more than twenty (20) hours per week, for a total of not more than one hundred (100) hours per month. Any police

provide, in part, that a part-time Law Enforcement Officer will work no more than twenty (20) hours per week or a total of no more than one hundred (100) hours per month. These rules and the statute also provide that any Law Enforcement Officer that works in excess of these maximum hours **shall** be reclassified to a full-time status and must meet all requirements for standards/training as mandated under the POST rules.

Holmes was employed by Grundy County Sheriff's Office on July 3, 2016 and was hired because of budgetary reasons. Grundy County could not afford a full-time deputy. (Shrum deposition page 56 Lines 5-14) Shelby Comer was shot and killed by Holmes when he was on duty and working for Grundy County Sheriff's Office on December 23, 2017. Holmes worked a total of eighteen (18) months from the date that the he was employed until he shot Shelby Comer. During this time Holmes worked more than one hundred (100) hours a month in sixteen (16) of the eighteen (18) months. In some of these months Holmes worked as many as 133.5 hours to 185 hours in a single calendar month. At no time during the eighteen months did Holmes meet the requirements for standards/training as mandated under the POST rules to act as a full time Law Enforcement Officer. (Second Amended Complaint paragraph 56; Answer of Shrum and Bean admits "that Defendant Holmes was not POST certified to work as a full-time officer as of December 23, 2017.)

Exhibit 40 (attached to this response as **Exhibit F**) to the deposition of Shrum is a collection of the Grundy County Sheriff's Department time sheets for Holmes. (Shrum

---

officer who works in excess of the maximum hours as specified in this subdivision (3) shall be reclassified to a full-time status and must meet all requirements for standards and training as mandated under the law and peace officer standards and training commission rules. In any situation where an officer is temporarily assigned, for a period of one (1) month or less, to work more than twenty (20) hours per week, for a total of not more than one hundred (100) hours per month, the officer shall not be reclassified to a full-time status;"

deposition Page 153 Line 23; Page 143 Lines 1-8) Each of the time sheets are authorized by Shrum and reviewed by Bean and each record or pay period contains their signatures. (Shrum deposition Page 143 Lines 9-25 & Exhibit 40) These time sheets establish that Holmes worked the following hours per month; in 2016 July **92.5**, August **108**, September **96**, October **120**, November **146** and December **137.50**. In 2017; January **132**, February **105**, March **113**, April **127**, May **138**, June **113**, July **113**, August **144**, September **185**, October **132**, November **119** and December **133.50**.

The statute and rules require that because Holmes worked more hours per month than allowed by POST rules Holmes was required to be reclassified to a full time officer and was required to meet all requirements for standards/training as mandated under the POST rules for a full time Law Enforcement Officer. Shrum and Bean allowed, sanctioned and were aware that Holmes worked significantly more hours per month than permitted by POST rules however the Defendant Shrum and Bean failed to require the Defendant Holmes to meet all requirements for standards/training as mandated under the POST rules for a full time or certified Law Enforcement Officer. As a direct and proximate result of violating the POST rules as well as *T.C.A.* 38-8-101(3) Shrum and Bean knowingly allowed an unqualified and untrained individual, Holmes, to regularly and routinely act and perform the job and function as a full time Law Enforcement Officer knowing that Defendant Holmes was not qualified or allowed under Tennessee law, to act as or perform the duties and responsibilities of a full time Law Enforcement Officer. In this case Shrum and Bean flaunted POST rules and Tennessee statutes by allowing Holmes an individual not POST certified to act as a certified or full-time officer without the required basic law enforcement training required by law.

Plaintiffs' expert Robert E. Allen, Jr. has filed his affidavit that Holmes was performing the job of a certified officer when Shelby Comer was shot. However Holmes was not legally qualified to act because he was not certified by POST. (See: Allen affidavit pages 21-22)

## B
## PART TIME OFFICER

The POST rules for a part-time officer are simple and straight forward. *T.C.A.* 38-8-101 (3) and POST rule 1110-08-.03 provides in part that any person utilized as a part-time law enforcement officer shall receive eighty (80) hours of training in whatever duties they are required by the employing agency, in this case Grundy County Sheriff's Office. This training shall be accomplished during the first calendar year of employment. During this initial period, prior to receiving eighty (80) hours of training the part-time law enforcement officer must be paired with a field training officer or other certified officer. This rule[14] requires that the specified training for a part-time law enforcement officer shall be accomplished during the first calendar year of employment. Further, until the eighty (80) hours of training is accomplished the part-time law enforcement officer must be paired with a field training officer or other certified officer. The term "paired" means "in the presence of". POST rule 1101.01-.(22)

Shrum and Bean knowingly violated the part-time rule by: (1) failing to provide the 80 hours of training in the first calendar year of employment (2) failed to provide Holmes with 80

---

[14] This rule is: "Training Requirements. After January 1, 1989, any person newly employed/utilized as a part-time/temporary/reserve/auxiliary law enforcement officer or special deputy shall receive eighty (80) hours of training in whatever duties they are required to perform by the employing agency. This training shall be accomplished during the first calendar year of employment. During this initial period, prior to receiving eighty (80) hours of training, the part-time/temporary/reserve/auxiliary law enforcement officer must be paired with a field training officer or other certified officer. Any part-time/temporary/reserve/auxiliary law enforcement officer who is hired within five years of having served as a full-time, certified law enforcement officer will continue to be exempt from the requirement that he/she be paired with a full-time, certified officer as long as he/she completes in-service training each year and has no break in service.

hours of training through December 23, 2017 and (3) they did not require Holmes to be paired with a certified officer.

Shrum has testified that POST rules allow a law enforcement agency to employ an individual that has not had any police training to be a part-time officer. Shrum admitted that POST rules require 80 hours of training. (Shrum deposition Page 68 Lines 1-9) Shrum thought the 80 of training was required in the first year of employment not in the first calendar year of employment. (Shrum deposition Page 68 Lines 10-17) Shrum acknowledged that this 80 of training was to be given by the agency or in this case Grundy County. (Shrum deposition Page 68 Lines 18-24)

POST rules require that the employing agency keep all training records. (See POST rule 1110-08-.05) Further the rule requires that the training be in "whatever duties they are required to perform by the employing agency." (Shrum deposition Page 69 Lines 11-17) Shrum hired Holmes to perform the "basic deputy's job duties." (Shrum deposition Page 69 Lines 18-21) This included investigate crimes, make arrests, pursue vehicles if needed. (Shrum deposition Page 70 Lines 3-12) However Shrum has admitted that Holmes did not receive the 80 hours of training in 2016 the calendar year that Holmes was hired. It took ten months and was not complete until May of 2017. (Shrum deposition Page 72 Line 11- Page 73 Line 8; and Page 74 Line 21-page 75 Line 1) According to Shrum after May of 2017 Holmes did not need to be paired with another officer. (Shrum deposition Page 75 Lines 2-10) Shrum ignored the POST rules and failed to require Holmes to obtain the 80 hours of training is the calendar year that Holmes was employed. As a result Holmes was not qualified to be a part-time officer.

Next Shrum failed to require Holmes to complete the 80 hours of training before he shot Shelby Comer on December 23, 2017. Exhibit 30 to Shrum's deposition (attached to this

response as **Exhibit G**) is the 2016 in-service training roster. It has the dates of the in-services and then the testing score. According to Shrum Holmes attended all of these hours of training. (Shrum deposition Page 104 Lines 7-20) Exhibit 26 to Shrum's deposition in the in-service training roster for Holmes for 2017. (attached to this response as **Exhibit H**). It also has 40 hours of in-service training recorded over several dates. (Shrum deposition Page 73 Lines 12- Page 74 Line 2) The two in-service rosters for 2016 and 2017 there are the only records for training of Holmes. (Shrum deposition Page 118 Line 21-Page 119 Line 8) These two rosters assert that Holmes received 80 hours of training by the end of the 2017 in-service roster or May of 2017. However there are serious doubts concerning the accuracy of the 2016 training roster.

The <u>first</u> issue is Exhibit 33 (attached to this response as **Exhibit I**). This is a "Certificate of Completion" "prepared for in-service completion by Chief Bean." (Shrum deposition Page 113 Lines 15-19) This certificate certifies that Holmes received the <u>80 hours</u> of training pursuant to POST requirements by August 31, 2016. Shrum testified that this document was prepared "in house"; "took time to put together" was extensive **and was not correct**. (Shrum deposition Page 113 Line 24-Page 114 Line 22)

The <u>second</u> issue is the training list on Exhibit 30 (attached to this response as **Exhibit G**) is the 2016 in-service roster; all but one of the dates that the training was given was before Holmes started working for Grundy County Sheriff's Department. Shrum testified that he believed that Holmes did receive the training at Grundy County. However Shrum's explanation was that the Cowen Police Department participated in some in-service with "us", Grundy County. (Shrum deposition Page 116 Lines 1-14) Mike Holmes worked for the Cowen Police Department before coming to Grundy County. However Holmes stopped working for the Cowen Police Department in September or October of 2014. (Holmes deposition Page 9 Line 25-Page

10 Line 13) After leaving Cowen Holmes did not work in law enforcement until he went to work for Grundy. (Holmes deposition Page 11 Lines 8-12) However according to Holmes Chief Bean called him, Holmes, and said "Hey we're having in-service. You just come." (Holmes deposition Page 19 Lines 14-19)

Predictably Holmes agreed with the story that he attended in-service training with Grundy County in January, February, March, April and May of 2016 even though he was not employed by Grundy County or any other police department. His reason? "To keep my time up. I mean, I been at this too long." (Holmes deposition Page11 Lines 13-25) There is no advantage to "keeping up my time". POST requires 40 hours of in-service every year. It does not carry forward.

According to Exhibit 30 there was in-service training on January 27, 2016. Holmes does not know if he was there and has no documents to show that he was there. There was a class on February 24, 2016. Again Holmes does not know if he was there. The same is true for the in-service classes held on March 30, 2016; April 27, 2016; and May 25, 2016. (Holmes deposition Page 17 Line 22-Page 19 Line 2)

The third issue is the form of Exhibit 30 itself. All of the information is typed. The dates of the classes are typed except for the year. The number 16 is hand written. Chief Bean that prepared the document did not know why the 16 was written in. (Deposition of Tony Bean Page 9 Line 21-Page 10 Line 6; excerpts attached **as Exhibit J** to this response.)

### GENERAL LACK OF TRAINING IN THE USE OF DEADLY FORCE

Plaintiffs' use of force expert, Robert E. Allen, Jr, has given an affidavit in support of Plaintiffs response. This affidavit makes it clear that, from a review of the training records, Holmes did not receive any documented training or education on the use of deadly force during

his training with Grundy County. In the 2016 and 2017 in-service training documents, Exhibits 26 and 30 to Shrum's deposition there are no classes that are listed as "use of force". Use of force may be or could have been taught in the fire arms portion of the in-service but it is not listed in those documents. In addition the tests given in 2016 and 2017 to test the officer's knowledge ask no questions concerning use of force issues mush less deadly force issues. Even if the subject was covered the employer would have no way of knowing if the officer had understood the instruction unless there are questions to test his knowledge.

Bean was in charge of the in-service training. Bean was the general department instructor in 2016 and 2017. (Shrum deposition Page 52 Lines 3-9) He put the lesson plans together. He had the final say in the lesson plans. (Shrum deposition Page 48 Line 14-Page 49 Line 6) Bean testified that Holmes received training on the use of deadly force and it would have been in the firearms portion of the training. (Bean deposition Page 31 Lines 9-21) Bean was not the instructor however. It was an individual named Charlie Wilder. (Bean deposition Page 31 Lines 20-22) According to bean this instruction would have been "[w[hen you should draw your weapon, when you use it, after you use it what happens to the weapon, just basic training of the weapon itself and when you use it and how you use it." (Bean deposition Page 31 Line 23-Page 32 Line 3) However Bean was not sure what Wilder did or did not do. Bean was not sure what wilder taught. (Bean deposition Page 32 Lines 8-22) Bean sat in on ever class. But he could not say if there was any instruction on what courts have determined is legal for the use of deadly force. (Bean deposition Page 33 Lines 3-11) Holmes could not remember if he had received any training on the use of deadly force in 2016 or 2017 when he was a part-time deputy with Grundy County. (Holmes deposition page 90 Lines 9-24)

Plaintiffs' expert Robert E. Allen, Jr. has filed his affidavit that in his opinion the training that Shrum and Bean contend they provided was not sufficient in the case of Holmes because the only training given was regular in-service training. That training on the use of deadly force is not sufficient for an individual such as Holmes that is not and never was a certified officer. (See: Allen affidavit pages 20-21)

## DEFENDANTS' THIRD ISSUE

The Defendants' third issue is they did not shot or participate in the shooting death of Shelby Comer. While neither were present when Holmes shot Shelby Comer their actions directly led to her death. Defendants rely principally on two cases, *Petty v County of Franklin* 478 F.3d 341 (6th Cir. 2007)[15] and *Shehee v Lultrell* 199 F.3d 295, 300 (6th Cir. 1999), and assert that Plaintiffs must establish that Defendants personally participated in, or otherwise authorized, approved or knowingly acquiesced in, the alleged unconstitutional conduct by Defendant Holmes.

The Plaintiffs have made no claim that Shrum or Bean were present or personally participated in the shooting death of Shelby Comer because neither were in fact present nor fired a single shot on December 23, 2017. **However** Shrum and Bean abdicated their job responsibility, and the active performance of their individual job function which directly resulted in the constitutional injury to Shelby Comer. At a minimum Plaintiffs have shown that a supervisory official, Shrum and Bean, at least implicitly authorized, approved or knowingly acquiesced in the unconstitutional conduct of the offending subordinate, Holmes. *Troutman v Louisville Metro Department of Corrections* 979 F.3d 472, 487-488 (6th Cir. 2020)

As explained in detail above Holmes did not meet the minimum training requirements to

---

[15] This case was recognized as being abrogated by *Bailey v City of Ann Arbor* 860 F.3d 362, 389 (6th Cir. 2017)

Case 4:18-cv-00058-TRM-SKL   Document 78   Filed 04/18/21   Page 22 of 25   PageID #: 1174

act as a certified officer. Holmes was therefore not meet minimum Tennessee requirements as a matter of law to be acting as a police officer on the night he shot and killed Shelby Comer. Shrum and Bean knew this fact and authorized and approved Holmes actions. Also Holmes was not qualified to act alone as a pat-time officer because he did not have the required 80 hours of training.

In ***Peatross v City of Memphis*** 818 F.3d 233 (6th Cir. 2016) two officers, Dunaway and McMillen, shot Vanterpool. The plaintiff, an Estate, sought to hold Armstrong, director of the Memphis Police Department, liable in his individual capacity under a claim of supervisory liability. *Id.* at 240-241. The court then explains how individual capacity claims and official capacity claims differ.

> "* * * It is important to note at the outset that a § 1983 *individual*-capacity claim differs from a § 1983 *official*-capacity claim. *See* Essex, 518 Fed.Appx. at 354 An official-capacity claim against a person is essentially a claim against the municipality. *Id.* On the other hand, an individual-capacity claim seeks to hold an official personally liable for the wrong alleged. *See id.* "On the merits, to establish *personal* liability in a § 1983 action, it is enough to show that the official, acting under color of state law, caused the deprivation of a federal right[.]" Leach v. Shelby Cty. Sheriff, 891 F.2d 1241, 1245 (6th Cir.1989) (internal quotation marks omitted) (quoting Kentucky v. Graham, 473 U.S. 159, 166, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985)). However, "[m]ore is required in an official-capacity action.... [T]he entity's 'policy or custom' must have played a part in the violation of federal law." *Id.*" *Id.* at 240-241

The court in ***Peatross v City of Memphis*** then explains that "[s]upervisors are often one step or more removed from the actual conduct of their subordinates; therefore, the law requires more than an attenuated connection between the injury and the supervisor's alleged wrongful conduct."*Id.* at 241(Citations omitted.) The court makes it very clear that "active" behavior does not mean "active" in the sense that the supervisor must have physically put his hands on the injured party or even physically been present at the time of the constitutional violation. Also that personal involvement is not limited solely to situations where a defendant violates a plaintiff's rights by physically placing hands on him. The court also notes that encouragement,

23

authorization, approval, and knowing acquiescence are all sufficient to confer liability. *Id.* at 242[16] In fact a defendant may knowingly acquiesce in the unconstitutional conduct of his subordinates through the execution of his job functions, including by failing to take precautions against likely violations. *Garza v Lansing School District* 972 F.3d 853, 865 (6ht Cir. 2020) *Peatross v City of Memphis* the court interpreted this standard to mean that "at a minimum," the plaintiff must show that the defendant "at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Id.* at 242 The supervisor need not have known of the substantial risk to the injured party but rather must have possessed knowledge of potential danger to a particular class of persons. *Troutman v Louisville Metro Department of Corrections* 979 F.3d 472 (6th Cir. 2020)

Because Holmes was in reality working as, and performing the job function, of a full time officer POST rules and Tennessee law required that Holmes have attended and successfully completed the course of study and education to be a full time or certified officer. Holmes had not attended or obtained the required training and education and was therefore in violation of POST rules and Tennessee law on the night he shot and killed Shelby Comer. Shrum and Bean are liable because they abandoned the specific duties of their position in the face of actual

---

[16] The quote from the court is set out in this footnote: "However, "active" behavior does not mean "active" in the sense that the supervisor must have physically put his hands on the injured party or even physically been present at the time of the constitutional violation. *See, e.g., Campbell,* 700 F.3d at 790 (holding that a police chief was not entitled to qualified immunity although he was not "actively involved in the incidents" at issue); *Dodds v. Richardson,* 614 F.3d 1185, 1195 (10th Cir.2010) (explaining that "[p]ersonal involvement is not limited solely to situations where a defendant violates a plaintiff's rights by physically placing hands on him") (alteration in original) (internal quotation marks omitted); *cf. Doe v. City of Roseville,* 296 F.3d 431, 440 (6th Cir.2002) (noting that encouragement, authorization, approval, and knowing acquiescence are all sufficient to confer liability). *But see Combs v. Wilkinson,* 315 F.3d 548, 558 (6th Cir.2002) ("Because plaintiffs fail to present any evidence that Wilkinson, who was not even present ... on the evening of the disturbance, engaged in active unconstitutional behavior, we affirm the summary judgment in his favor.")." *Peatross v City of Memphis* 818 F.3d 233, 242 (6th Cir. 2016)

knowledge of a breakdown in the proper workings of the department. ***Troutman v Louisville Metro Department of Corrections*** 979 F.3d 472, 487 (6th Cir. 2020)

Shrum and Bean abandoned the specific duties of their position because they knew that Holmes was working more than 100 hours per month in violation of POST rules. This is clearly a breakdown in the fundamental workings of the Sheriff's office. They knowing allowed an unqualified individual to be armed with a deadly weapon, a badge and a marked patrol car and empowered to make arrests. All of which cause the death of Shelby Comer.

## CONCLUSION

The shooting of Shelby Comer was a clear violation of the Fourth Amendment. Shrum and Bean are not entitled to qualified immunity in their official capacity. Shrum and Bean established and maintained a policy of allowing Holmes to act as a certified officer when they knew he was not in fact certified or trained. The Defendants' motion should be denied in total.

Respectfully submitted,

/s/ Fred C. Dance
Fred C. Dance, BPR #7004
Attorney for Plaintiffs
234 First Avenue South
Franklin, Tennessee 37064
(615) 794-3450
Email: fdclaw@bellsouth.net

## CERTIFICATE OF SERVICE

I hereby certify that on the 13th day of April 2021, I electronically filed this document along with any exhibits with the Clerk of Court using the CM/ECF system which will automatically send e-mail notification of such filing to the following attorneys of record:

B. Thomas Hickey, Jr.
Attorneys at Law
Spicer Rudstrom, PLLC
537 Market Street, Suite 203
Chattanooga, Tennessee 37402
bth@spicerfirm.com

D. Andrew Saulters
Attorney at Law
330 Commerce Street
Nashville, Tennessee 37201
dsaulters@ortalekelly.com
/s/ Fred C. Dance
Fred C. Dance

Case 4:18-cv-00058-TRM-SKL   Document 78   Filed 04/18/21   Page 25 of 25   PageID #: 1177